UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
WESTERN DIVISION

FILED
97 OCT -6 PM 1:59
U.S. DISTRICT COURT
N.D. OF ALABAMA

| | | |
|---|---|---|
| DIANE BROWN, et al., | ] | |
| | ] | |
| Plaintiff(s), | ] | |
| | ] | |
| vs. | ] | CV-96-N-1141-W |
| | ] | |
| ASTRON ENTERPRISES, INC., et al., | ] | |
| | ] | |
| Defendant(s). | ] | |

ENTERED
OCT 6 1997

**Memorandum of Opinion**

**I.   Introduction.**

In this Alabama state law action, the plaintiffs, Diane Brown and Thomas Brown ("the Browns"), claim injury caused by the alleged "negligent and wanton" operation of an aircraft by defendants, Astron Enterprises, Inc. ("Astron"), North American Flight Training Academy ("NAFTA"), and William L. Mabry. *Amended Complaint* at ¶¶ 2, 4, 12. The court has subject matter jurisdiction under 28 U.S.C. § 1332, complete diversity of citizenship between the parties. *Id.* at ¶ 5; *Answer of Astron to Amended Complaint* at ¶ 5; *Answer of NAFTA to Amended Complaint* at 8.[1]

The matter is presently before the court on motion of the defendant NAFTA for summary judgment, filed July 8, 1997. The motion has been fully briefed and is ripe for decision. Upon due consideration, the motion will be granted and claims against NAFTA will be dismissed with prejudice.

---

[1] By order of November 27, 1996, on motion of the plaintiffs, the court dismissed all claims against defendant Mabry, leaving only the claims against Astron and NAFTA.

## II.     Statement of Facts.[2]

On February 23, 1995, Paul Marko ("Marko"), a student pilot, set out from Chamblee, Georgia, in a Cessna 152 single engine aircraft on a solo cross-country flight for the purpose of furthering his goal of earning a private pilot's licence. At approximately 2 o'clock in the afternoon, the aircraft, with Marko at the controls, crashed into the Browns' home near Bessemer, Alabama. The National Transportation and Safety Board (the "NTSB") determined that Marko, though beginning his flight with more than adequate fuel, failed to lean the fuel mixture and that the probable cause of the accident was fuel exhaustion.[3] There were no personal injuries, either to Marko or persons on the ground. The plaintiffs, however, in addition to damage to their home, claim both compensatory and punitive damages for mental anguish and the loss of enjoyment of their home.

---

[2] The facts set out below are gleaned from the parties' submission of facts claimed to be undisputed, their respective responses to those submissions, and the court's own examination of the evidentiary record. These are the "facts" for summary judgment purposes only. They may not be the actual facts. *Cox v. Administrator U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994), *cert. denied*, 513 U.S. 1110 (1995).

[3] The NTSB Factual Report states in part:

The pilot filled out a flight plan for the cross-country flight. His estimated time en route was three hours and 18 minutes and he calculated four hours and 42 minutes of fuel on board. The pilot planned to stop at Walker County Airport to refuel the aircraft. The pilot stated that he overflew Walker County Airport, and about 20 miles from Shelby County, the engine sputtered. He attempted to reach the Shelby County Airport, near Bessemer, Alabama. Unable to reach the airport, he attempted to land at a private airstrip that he observed. A landing approach was made to the private airstrip. The pilot saw that he could not make the field, and a go-around was executed. During the go-around, the engine quit, and the airplane impacted the roof of a house. *NTSB Factual Report - Aviation* at 1.

Specifically, the NTSB report concluded that the probable cause of the accident was "the pilot's failure to lean the fuel mixture, stop at the first destination to refuel, and his incorrect fuel consumption calculations." *Report of NTSB adopted 8/31/95.*

2

Marko rented the aircraft from NAFTA pursuant to an agreement between NAFTA and Marko's flying instructor, Michael O'Neal.[4] The agreement permitted O'Neal, a self-employed Certified Flight Instructor ("CFR"), to use the aircraft for training purposes. As permitted by the authority granted him by the Federal Aviation Administration ("FAA") as a CFR, O'Neal authorized his student Marko to make flight from Georgia into the state of Alabama. The plaintiffs posit that NAFTA also "authorized" the flight because it had "control" over the aircraft. Nonetheless, NAFTA had no specific knowledge of the flight or of Marko's qualifications, nor was it required by the FAA to have such knowledge when such a flight was authorized by a qualified instructor.

NAFTA contends that the true owner of the aircraft is its co-defendant Astron and not NAFTA. The evidence on summary judgment consideration is that Astron possessed the title and registration; NAFTA had agreed to purchase the aircraft from Astron and has assumed actual possession; and NAFTA had made periodic payments toward the agreed upon purchase price, beginning in February 1994.[5] NAFTA stored the aircraft at Peachtree Dekalb Airport, where it permitted O'Neal to use it for flight training purposes, and where it rented the aircraft to Marko on the day of the crash.

NAFTA, a Georgia corporation, also contends that it conducts no business in Alabama and did not purposefully avail itself of the privileges and benefits of Alabama law.

---

[4] The evidence shows that O'Neal was a self-employed flight instructor who had contracted with NAFTA for the use of its aircraft in his business of providing flight training to student pilots.

[5] In February 1994, Joseph F. Karolyi wrote a personal check in the amount of $10,000 to Astron as a first payment on the purchase of two aircraft, one of which was the Cessna 152 that crashed into the Browns' home, to be used by NAFTA after its incorporation. NAFTA was incorporated in April 1994. At the time of the crash, a total balance of $13,000 remained due on the two aircraft. Karolyi has been president of NAFTA since its incorporation in April 1994.

While true that, prior to the crash, NAFTA had no contacts with the State of Alabama, the Browns contend that NAFTA did have contact with the state on the day of the crash, even though Marko was not engaged in furtherance of any business purpose for NAFTA in Alabama, other than rental of its aircraft.

### III.   Summary Judgment Standard

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)). The movants can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Celotex*, 477 U.S. at 322-23. There is no requirement, however, "that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim." *Id.* at 323.

Once the moving party has met his burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions of file,' designate 'specific facts showing that there is a

4

genuine issue for trial.'" *Id.* at 324 (quoting Fed. R. Civ. P. 56(e)). The nonmoving party need not present evidence in a form necessary for admission at trial; however, he may not merely rest on his pleadings. *Celotex*, 477 U.S. at 324. "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322.

After the plaintiff has properly responded to a proper motion for summary judgment, the court must grant the motion if there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The substantive law will identify which facts are material and which are irrelevant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. His guide is the same standard necessary to direct a verdict: "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52; *see also Bill Johnson's Restaurants, Inc. v. N.L.R.B.*, 461 U.S. 731, 745 n.11(1983). However, the nonmoving party "must do more than show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *Anderson*, 477 U.S. at 249

5

(citations omitted); *accord Spence v. Zimmerman*, 873 F.2d 256 (11th Cir. 1989). Furthermore, the court must "view the evidence presented through the prism of the substantive evidentiary burden," so there must be sufficient evidence on which the jury could reasonably find for the plaintiff. *Anderson*, 477 U.S. at 254; *Cottle v. Storer Communication, Inc.*, 849 F.2d 570, 575 (11th Cir. 1988). Nevertheless, credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are the function of the jury, and therefore the evidence of the non-movants is to be believed and all justifiable inferences are to be drawn in his favor. *Anderson*, 477 U.S. at 255. The non-movant need not be given the benefit of every inference but only of every reasonable inference. *Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

### IV.  Discussion.

Defendant NAFTA seeks summary judgment on three alternative grounds: (1) the court lacks *in personam* jurisdiction over NAFTA, a nonresident defendant; (2) NAFTA is not liable to plaintiffs on the merits; and (3) Marko is an indispensable party to this litigation, and in his absence, the case cannot proceed.

### A.  Personal Jurisdiction.

NAFTA argues that the court lacks personal jurisdiction because NAFTA has no contacts with Alabama other than when the plane it rented to Marko came to rest on the roof of the Browns' home and because that event was not the result of its own purposeful act. NAFTA does not dispute, however, that it rented the aircraft to Marko, a student pilot who followed his intended route into Alabama on the day of the crash. Therefore, NAFTA's argument fails under well established principles of due process.

6

The analysis begins as a two-step procedure. First, personal jurisdiction over a nonresident defendant by a federal court sitting as a diversity court is proper only if authorized by state law. *Cable/Home Communication Corp. v. Network Productions, Inc.*, 902 F.2d 829, 855 (11th Cir. 1990); *Alexander Proudfoot Co. [World Headquarters L.P. v. Thayer]*, 877 F.2d [912,] 919 (11th Cir. 1989). If a basis for personal jurisdiction exists under the forum state's long-arm statute, the federal court then must consider whether the exercise of personal jurisdiction would be consistent with federal due process requirements. The Due Process Clause of the Fourteenth Amendment requires sufficient minimum contacts between the forum state and the nonresident defendant so that "maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *International Shoe Co. v. Washington*, 326 U.S. 310, 316, (1945) (quoting *Milliken v. Meyer*, 311 U.S. 457, 463, (1940)); *Cable/Home Communication Corp.*, 902 F.2d at 855; *Alexander Proudfoot Co.*, 877 F.2d at 919. Only if both prongs of the analysis are answered in the affirmative may a federal or state court exercise personal jurisdiction over a nonresident defendant. *Id.* at 1514.

In Alabama, the reach of the state long-arm statute is equal to that of the Federal Constitution. Ala. R. Civ. P. 4.2(a)(2)(I); *Horn v. Effort Shipping Co., Ltd.*, 777 F. Supp. 927, 929 (S.D. Ala. 1991); *c.f. McDonnell v. Roy E. Beatty & Assoc., Inc.*, 418 S.E.2d 95, 96-98 (Ga. Ct. App. 1992) (construing Georgia long-arm statute as insufficient to confer jurisdiction over nonresident corporate lessor of aircraft that crashed in Georgia). Therefore, in Alabama, the two questions of the personal jurisdiction analysis collapse into one, and the only issue is whether a defendant has the "minimum contacts" with the state required for

the assertion of personal jurisdiction by the due process clauses of the United States Constitution as interpreted in *International Shoe* and its progeny. *Horn*, 777 F. Supp. at 929.

However, the principle governing this case was established long before shoes, made in Missouri, were sold in Washington by the International Shoe Company. In 1927, the Supreme Court validated state statutes that permitted the exercise of jurisdiction over nonresident motorists, without their expressed consent, for the torts they commit on the highways of the forum state. *Hess v. Pawloski*, 274 U.S. 352 (1927). These travelers were said to have given implied consent to a lawsuit wherever they operated this "dangerous instrumentality." *Hess*, 274 U.S. 352. Later statutes extended jurisdiction to operators of aircraft by nonresidents and even to automobile owners who never entered the forum state, but authorized use of the car within the forum state by another. *See Davis v. St. Paul-Mercury Indem. Co.*, 294 F.2d 641 (4th Cir. 1961); *Worthley v. Rockville Leasecar, Inc.*, 328 F. Supp. 185 (D. Md. 1971).

This principle survived *International Shoe* when that Court recognized that sporadic forum activity, even a single act, may suffice as "minimum contact" under certain circumstances to render the out-of-state defendant subject to personal jurisdiction upon claims arising out of that activity. *International Shoe Co.*, 326 U.S. at 318. However, this "specific jurisdiction" is appropriate only when the nonresident defendant's contacts with the forum state arise from, or are directly related to, the cause of action. *Wilson v. Belin*, 20 F.3d 644, 647 (5th Cir. 1994), *cert. denied*, 513 U.S. 930 (1994).

Nevertheless, NAFTA argues that its single contact with Alabama was not the result of its "own purposeful act," making this court's jurisdiction over it improper. *Movant's*

8

*Initial Submission in Response Exhibit D of the Courts Order* at 7. The Supreme Court has never considered a case exactly like this where the single contact with the forum state is by an instrumentality rented and operated by a third party. However, in a series of cases factually dissimilar to this one, which followed *International Shoe*, the Court has explained "specific jurisdiction" in some detail.

According to the Supreme Court, when a forum seeks to assert specific personal jurisdiction over a nonresident defendant, due process requires the defendant have "fair warning" that a particular activity may subject him to the jurisdiction of a foreign sovereign. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985); *Shaffer v. Heitner*, 433 U.S. 186, 218 (1977) (Stevens, J., concurring in the judgment). This fair warning requirement is satisfied if the defendant has "purposefully directed" his activities at the forum and, the litigation results from alleged injuries that "arise out of or relate to" those activities. *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 774, (1984); *Burger King*, 471 U.S. at 472 (quoting *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 (1984)).

Additionally, the defendant's conduct and connection with the forum must be of a character that he should reasonably anticipate being hailed into court there. *Burger King*, 471 U.S. at 474; *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297(1980). However, the unilateral activity of those who claim some relationship with a nonresident defendant cannot satisfy the requirement of contact with the forum State; there must be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws. *Hanson v. Denckla*, 357 U.S. 235, 253, *reh'g denied*, 358 U.S. 858 (1958). This requirement

assures that a defendant will not be hailed into a jurisdiction as a result of random, fortuitous, or attenuated contacts, or because of the unilateral activity of a third person. *Burger King*, 471 U.S. at 475; *Helicopteros*, 466 U.S. at 417; *Keeton*, 465 U.S. at 774. Jurisdiction is proper where the defendant's contacts with the forum proximately result from actions by the defendant himself that create a "substantial connection" with the forum state. *Burger King*, 471 U.S. at 475 (quoting *McGee v. International Life Ins. Co.*, 355 U.S. 220, 223 (1957)).

Although the concept of foreseeability is not irrelevant to this analysis, the kind of foreseeability critical to the proper exercise of personal jurisdiction, according to the Supreme Court, is not the ability to see that the acts of third persons may affect the forum, but rather that the defendant's own purposeful acts will have some effect in the forum. *Asahi Metal Indus. Co. v. Superior Court.* 480 U.S. 102, 112 (1987).

NAFTA's act of renting an aircraft to a student pilot in Georgia for the purpose of making a solo training flight into Alabama is sufficient to confer personal jurisdiction over NAFTA in this court. That act was purposeful on the part of NAFTA. It was directed at Alabama because the pilot stated his intention to come to Alabama in a pre-filed flight plan. Moreover, from the available evidence there is a reasonable inference that NAFTA was in the business of regularly renting aircraft to students who made cross-country flights. It is not unreasonable to infer that such training flights would cross into Alabama, and perhaps into other states. NAFTA could have reasonably anticipated being hailed into court here. And, NAFTA could certainly be expected to invoke the benefits and protections of Alabama's laws while its airplane was in Alabama.

However, NAFTA argues that it did not specifically authorize the flight and that jurisdiction is therefore founded upon the "unilateral act of a third party, Marko." *Movant's Initial Submission in Response to Exhibit D of the Court's Order* at 8. This argument relates more to the question of NAFTA's liability for acts of the person to which NAFTA entrusted its plane, not whether it is subject to adjudication of any such liability in this court.

Other federal courts have asserted jurisdiction in circumstances more attenuated than those present here. The Fourth Circuit found jurisdiction proper over the nonresident owner of an automobile who consented to use of the vehicle by her son's friends in another state. *Davis v. St. Paul-Mercury Indemnity Co.*, 294 F.2d 641, 645-49 (4th Cir. 1961). More recently, a Maryland district court found proper jurisdiction over the corporate owner of an aircraft in both Maryland, its state of incorporation, and Rhode Island, where the aircraft collided in mid-air with another small plane. *Worthley v. Rockville Leasecar, Inc.*, 328 F. Supp. 185, 188 (D. Md. 1971). Jurisdiction was proper over this nonresident corporate defendant when it allowed unrestricted use of the aircraft for non-business purposes by two men who took it from Maryland to Rhode Island on the day of the crash. *Id.*

Accordingly, the undisputed facts on NAFTA's motion for summary judgment suggest, and the court finds, that NAFTA is subject to the *in personam* jurisdiction of this court.

### B.     **NAFTA's Liability.**

NAFTA also asserts that it is not liable to these plaintiffs under any theory of tort liability. Plaintiffs assert liability under several theories.

11

First, plaintiffs allege that NAFTA is liable for their injuries because of its own "negligent and wanton conduct." *Amended Complaint* at ¶¶ 11-13. However, they claim no facts to support any direct liability on the part of NAFTA, when it rented an airplane to Marko. Plaintiffs do not allege, nor does the evidence indicate, that NAFTA may have acted negligently or wantonly in maintaining the aircraft or fueling the aircraft, or in entrusting it to Marko. Therefore, as a matter of law, no reasonable jury could find NAFTA directly liable to the Browns.

Next, plaintiffs allege that NAFTA is vicariously liable for the negligent or wanton conduct of Marko. *Amended Complaint* at ¶¶ 6-9, 11. Specifically, plaintiffs allege that because Marko was "a student of . . . NAFTA," this defendant "was responsible for training the pilot," and that NAFTA "allowed [Marko] use of [the aircraft]." *Id.* at 6-7. The undisputed evidence, however, is that "[a]ll NAFTA did in this process was rent the aircraft." *Movant's Initial Submission in Response to Exhibit D of the Court's Order* at 3; *Opponents' Statement of Facts in Response to Exhibit "D" of the Court's Order* at ¶ 19. Furthermore, plaintiffs admit Marko was neither an employee nor an agent of NAFTA. *Movant's Initial Submission in Response to Exhibit D of the Court's Order* at 3; *Opponents' Statement of Facts in Response to Exhibit "D" of the Court's Order* at ¶ 17. Therefore, the only relationship between Marko and NAFTA was that of bailor to bailee.

In the absence of a statute creating such liability, a bailor to bailee relationship is not sufficient to impute liability from the negligent bailee to the innocent bailor in any state in this nation. Restatement (Second) of Torts § 480; W. Page Keeton, et al., Prosser and Keeton on the Law of Torts, § 74, at 532 & n.32 (5th ed. 1984); *Morgan County v. Payne*, 93

So. 628, 630 (Ala. 1922); *Ferrari v. Byerly Aviation*, Inc., 268 N.E.2d 558, 559 (Ill. App. Ct. 1971). Furthermore, even if a reasonable jury could find a teacher to student relationship, which it could not in this case, no state recognizes that relationship as sufficient to impute liability from the student to the teacher. 57B Am. Jur. 2d *Negligence* §§ 1786-1818 (1989); *accord Johnson v. Central Aviation Corp.*, 229 P.2d 114, 119-120 (Cal. Dist. Ct. App. 1951) (aviation school not liable for acts of its student under theory of respondeat superior). Therefore, absent statutory authority, no reasonable jury could find NAFTA vicariously liable for the independent acts of Marko.

Finally, plaintiffs contend that NAFTA is liable because it was "engaged in the operation of the aircraft which crashed into [their house] within the meaning of the *Ala. Code*, § 4-2-3(9) (1975)." *Amended Complaint* at ¶ 8. Specifically, plaintiffs argue that the "Definitions" section of the Alabama Aeronautics Department Act of 1945 ("Act"), *Ala. Code* § 4-2-3(9) (1975), repealed the previously established common law in Alabama and, by implication, made the owner of an aircraft vicariously liable for the torts of his bailee.

The stated purpose of the Act was to regulate air travel and airport operations in this state.[8] *Id.* at § 4-2-1. In its "Definition" section, the Act defines forty-four terms, which are

---

[8] The stated purpose of the Act was:

> It is hereby declared that the purpose of this chapter is to further the public interest and aeronautical progress by encouraging and developing the safe use of aircraft for business and pleasure, by revising existing statutes relative to the development and regulation of aeronautics in order that the state may properly perform its functions relative to aeronautics, may cooperate with and assist its political subdivisions and others engaged in aeronautics, may develop a statewide system of airports and other aeronautical facilities and may effectively exercise its jurisdiction over persons and property within such jurisdiction by providing for the protection and promotion of safety in aeronautics, by cooperating in effecting a uniformity of the laws relating to the development and regulation of aeronautics in the several states through the establishment of uniform regulations consistent with those of the federal government and of other states, in order that those engaged in aeronautics of every character may so engage with

13

"[f]or the purpose of the laws of this state relating to aeronautics." *Id.* at § 4-2-3. The portion of the "Definitions" section upon which the plaintiffs rely defines "Operation of Aircraft" as follows:

> The use of aircraft for the purpose of air navigation and includes the navigation or piloting of aircraft. Any person who causes or authorizes the operation of aircraft, whether with or without the right of legal control (in the capacity of owner, lessee or otherwise) of the aircraft, shall be deemed to be engaged in the operation of aircraft within the meaning of the statutes of this state. *Id.*

The following sections of the Act refer to "operation" of an aircraft eight times, never in connection with any tort liability, but rather in connection with criminal liability for "reckless flight," inspections of aircraft, control of airspace, and licensure of operators. *Id.* at §§ 4-2-10, 50, 70, 72, 76, 78, 79, 80.

The plaintiffs argue that the Act's definition of aircraft operation imputes tort liability to NAFTA because it does not limit the operation of an aircraft to the pilot. They argue that, under this statutory definition, NAFTA was "engaged in the operation of" its aircraft when it collided with the Brown's roof. Alabama courts have not interpreted the Act's definition of "operation" of an aircraft. Therefore, this court must ascertain for itself whether the Act creates a cause of action against NAFTA.

Textually, the statute would not appear to make NAFTA liable as an "operator" of the aircraft for the conduct of Marko. Even if the court accepts plaintiffs' argument that the Act defines NAFTA as an "operator" of the aircraft, the Act does not address any resulting

---

the least possible restriction consistent with safety and the rights of others and by providing for cooperation with the federal and state authorities in order that costly and unnecessary duplication of functions may be eliminated. Ala. Code § 4-2-2 (1975).

14

consequences of being an "operator" for purposes of civil tort liability. On the contrary, the Act limits application of its "Definitions" to "the laws of this state relating to aeronautics." *Ala. Code* § 4-2-3 (1975). Furthermore, the court can find no indication that the legislature intended to create new tort liability with this enactment. The title of the Act indicates an intent to create the "Department of Aeronautics." *Id.* at § 3-2-1. The express purpose of the Act does not allude to any tort liability, but rather to such things as regulation of aeronautics, promotion of safety, uniformity of laws, and elimination of costly and unnecessary duplication of functions with the federal government and other states. *Id.* at § 3-2-2. Nowhere does the Act indicate any intention by the legislature to change the common law liability of bailors and bailees with respect to aircraft.

Although Alabama courts have not addressed his issue, other courts have considered similar statutes in other states, all adapted from the Uniform Aviation Act. In the 1950's, several courts held that similar state statutes imputed liability to owners for the acts of others who took possession of their aircraft. The New Hampshire Supreme Court held the owner of a plane liable for injuries to a child, under a similar statute, when a student pilot, on approach to an airstrip, flew it over an adjacent hay field, causing a horse to bolt and run into a child. *Hoebee v. Howe*, 97 A.2d 223, 223-26 (N.H. 1953). The Fifth Circuit interpreted a substantially identical Mississippi statute, "as a matter of public policy," against the owner of a crop-dusting plane, when the plane, piloted by the owner's partner, struck a field worker. *Hays v. Morgan*, 221 F.2d 481, 482-83 (5th Cir. 1955). In 1957, the Iowa Supreme Court followed the Fifth Circuit and the New Hampshire Supreme Court in construing its own state statute. *Lamasters v. Snodgrass*, 85 N.W.2d 622, 625 (Iowa 1957);

15

c.f. *Heidemann v. Rohl*, 194 N.W.2d 164, 166-67 (S.D. 1972) (involving choice of law, assuming that Nebraska would follow *Lamasters*, but instead applying South Dakota statute with no imputed negligence absent a master-servant relationship); *Allegheny Airlines, Inc. v. U.S.*, 504 F.2d 104, 114-15 (7th Cir. 1974), *cert. denied*, 421 U.S. 978 (1975) (holding that a somewhat different Indiana state statute imputes liability to absent owner of an aircraft); *Ross v. Apple*, 240 N.E.2d 825, 830 (Ind. App. 1968), *reh'g denied*, 241 N.E.2d 872 (1968) (allegations against aircraft owner sufficient to survive demurrer to complaint).

All these early cases were decided during a period when operation of an aircraft was considered ultra-hazardous activity, a view that no longer exists. *See e.g. Rosdail v. Western Aviation, Inc.*, 297 F. Supp. 681, 685 (D. Colo. 1969); *Ferrari*, 268 N.E.2d at 561; Ann T. Hollyday, *Aviation Law: Owner-Lessor Liability—The Need for Uniformity*, 36 Me. L. Rev. 93, 94, n.14 (1984). According to the common law relating to ultra-hazardous activities, existing at the time, an owner was liable for a bailee's negligence. Restatement Torts § 520, comment b, clause a (1938). Consequently, these early decisions did not stretch the language of an unrelated state statute to alter the common law; rather they held that the statute was consistent with the common law at that time.

More recently, the Montana Supreme Court refused to construe a similar subsection of its state's statute as imputing liability to aircraft owners for the acts of others. *Haker v. Southwestern Ry. Co.*, 578 P.2d 724, 728 (Mont. 1978). In that case, an employee of the corporate owner flew its aircraft on two low sweeps over a bar in Montana and then up into the hills where it crashed. *Id.* at 725-26. However, no liability attached to the owner

16

because the pilot was acting outside the scope of his employment at the time of the crash and because Montana's statute did not otherwise abrogate the common law rule. *Id.* at 729.

Likewise, in 1971, an appellate court in Illinois refused to construe its state's version of the Uniform Aviation Act to impute liability to the owner of a small plane for the alleged negligence of the pilot who rented the plane. *Ferrarri*, 268 N.E.2d at 559-60. Finally, a federal district court in North Carolina, hearing a diversity case, cited the modern trend in *Hacker* and *Ferrari*, holding that a similar North Carolina statute did not impute liability to the bailor of an aircraft for actions of its bailee. *Broadway v. Webb*, 462 F. Supp. 429 (W.D.N.C. 1977).

The Alabama Act, like many other state statutes, is also similar to The Federal Aviation Act of 1958. 49 U.S.C. § 1301(26), *repealed*, ___ . That federal statute has never been interpreted to create a private cause of action against absent owners of aircraft. *See Bonner v. United States Fire Ins. Co.*, 494 So.2d 1311, 1315 (La. Ct. App. 1986), *writ denied*, 497 So.2d 1017 (La. 1986); *McCord v. Dixie Aviation Corp.*, 450 F.2d 1129, 1130 (10th Cir. 1971); *Rosdail v. Western Aviation, Inc.*, 297 F. Supp. 681, *Yelinek v. Worley*, 284 F. Supp. 679 (E.D. Va. 1968); *McDaniel v. Ritter*, 556 So. 2d 303, 312 (Miss. 1990); *Nashsin v. De La Bretonne*, 95 Cal. Rptr. 227, 228 (Cal. Ct. App. 1971); *see also Ferrari*, 268 N.E.2d at 561 (erroneous interpretation of federal statute by *Hoebee*, *Hays* and *Lamasters*). Most notably, the Fifth Circuit refused to apply its own 1955 ruling in *Hays*, upon which these plaintiffs rely, to the similar federal statute. *Rogers v. Ray Gardner Flying Serv., Inc.*, 435 F.2d 1389, 1391-95 (5th Cir. 1970), *cert. denied*, 401 U.S. 1010 (1971); *see also McDaniel*, 556 So. 2d at

312, n.7 (dicta by the Mississippi Supreme Court noting recent criticism of Fifth Circuit's construction of its own state statute in *Hays*).

Accordingly, based upon the plain meaning of the Act, the intent of the Alabama legislature as manifested by the Act's title and the expressed purpose of the Act, and the modern trend in other jurisdictions with similar enactments, this court is persuaded that Alabama would not hold NAFTA liable for the independent acts of a third party who rented NAFTA's aircraft. Therefore, because the undisputed facts before the court on summary judgment clearly indicate that NAFTA was not directly liable and was nothing more than a bailor, NAFTA is entitled to summary judgment and dismissal of the claim against it.[7]

## V. Conclusion.

NAFTA's motion for summary judgment is due to be granted. The court will enter an appropriate order in conformity with this opinion.

Done, this 6th of October, 1997.

EDWIN L. NELSON
UNITED STATES DISTRICT JUDGE

---

[7] NAFTA's final ground argued in support of its motion for summary judgment is that Marko, the student pilot, is an indispensable party in this lawsuit. That argument is not well taken and requires no discussion.